UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DAVID J. DEGORTER,                    )
                                      )
                    *Plaintiff*,      )
                                      )
          *vs.*                       )        No. 1:19-cv-03737-JMS-TAB
                                      )
CLEARPOINT FEDERAL BANK & TRUST       )
and MICHAEL H. DEVLIN, II,            )
                                      )
                    *Defendants*.     )

## ORDER

On August 28, 2019, Plaintiff David J. deGorter filed a Complaint against ClearPoint Federal Bank & Trust ("ClearPoint") and Michael H. Devlin, relating to an employment arrangement between ClearPoint and Mr. deGorter. [Filing No. 1-4.] On September 3, 2019, Mr. Devlin removed the case to this Court. [Filing No. 1 at 1.] Presently pending before the Court are Motions to Dismiss filed by ClearPoint and Mr. Devlin. [Filing No. 1; Filing No. 25.] Both Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court finds that Mr. deGorter's breach of fiduciary duty claim against Mr. Devlin may proceed in the context of Mr. Devlin's role as a fellow shareholder, but that Mr. deGorter's remaining claims must be dismissed at this stage. Accordingly, as explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Mr. Devlin's Motion to Dismiss and **GRANTS** ClearPoint's Motion to Dismiss.

## I.
### LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93

(2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary, the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).

A motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.
### BACKGROUND

The following are the factual allegations set forth in Mr. deGorter's Complaint, which the Court must accept as true.

Mr. deGorter was a member of the Board of Directors of ClearPoint, which "is a federally chartered institution classified by the Office of the Comptroller of the Currency ('OCC') as a 'savings association.'" [Filing No. 1-4 at 1.] Mr. Devlin was the Chair of the Board of Directors of ClearPoint and is a shareholder of ClearPoint. [Filing No. 1-4 at 1.]

In 2017, Mr. Devlin approached Mr. deGorter about whether Mr. deGorter would be willing to become the President and CEO of ClearPoint and, if so, what terms he would require to

take on those roles. [Filing No. 1-4 at 2.] Mr. deGorter said that he would agree to become the President and CEO on the following conditions: (1) he would receive the same level of base compensation as the outgoing President; (2) ClearPoint would agree to facilitate Mr. deGorter's purchase of 30% of the total equity of ClearPoint; (3) ClearPoint would agree to adopt and implement a plan whereby ClearPoint would award directors and certain managers, including Mr. deGorter, certain equity-like benefits; and, (4) ClearPoint would agree to continue to pay Mr. deGorter the fees he had been receiving as a member of the Board of Directors. [Filing No. 1-4 at 2.] On ClearPoint's behalf, Mr. Devlin agreed to these conditions. [Filing No. 1-4 at 2.]

To enable him to acquire 30% of the total equity of ClearPoint, Mr. deGorter needed to obtain approval from the OCC to become a "Control Party" (meaning a shareholder who owns 10% or more of the equity). [Filing No. 1-4 at 2.] To accomplish this, Mr. Devlin put Mr. deGorter in touch with Mr. Devlin's and ClearPoint's counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), to assist Mr. deGorter in preparing and filing the OCC paperwork at ClearPoint's expense. [Filing No. 1-4 at 3.] Mr. Devlin and ClearPoint, on the advice of counsel, formulated a plan whereby some shareholders would sell their interests in ClearPoint to prepare for Mr. deGorter's purchase of 30% of the total equity. [Filing No. 1-4 at 3.]

As of November 2017, ClearPoint had 10,000 shares of stock owned by three shareholders: (1) Michael Poulos (5,992 shares (59.92%)); (2) Robert M. Devlin (Mr. Devlin's father) (2,088 shares (20.88%)); and, (3) Curragh Capital Partners II, L.P. ("Curragh") (a business co-owned by Mr. Devlin's father and brother) (1,920 shares (19.20%)). [Filing No. 1-4 at 3.]

ClearPoint and Mr. Devlin organized the sale of all of Mr. Poulos' shares to eight different purchasers: (1) Curragh (2,010 shares (20.1% of total equity)); (2) Mr. deGorter's IRA (990 shares (9.9% of total equity)); (3) Mr. Devlin (746 shares); (4) Mr. Devlin's brother (746 shares); (5)

Chilton Global Management Partners LTD (716 shares); (6) William M. Keeler 2006 Trust (342 shares); (7) Thomas B. Michaud (342 shares); and, (8) Robert J. Colangelo (100 shares). [Filing No. 1-4 at 3-4.]

Through this sale, Mr. deGorter (through his IRA) became the owner of 9.9% of the total equity of ClearPoint, which was the highest percentage he could own prior to being approved by the OCC as a Control Party. [Filing No. 1-4 at 4.] Curragh acquired an additional 20.1% of the equity of ClearPoint (which represents the remaining amount of Mr. deGorter's 30% that he was to acquire as part of the agreement with ClearPoint). [Filing No. 1-4 at 4.] Wachtell filed the paperwork with the OCC, noting Mr. deGorter's acquisition of 9.9% of the equity and his plan to acquire an additional 20.1% of the equity from Curragh. [Filing No. 1-4 at 4-5.]

While this was taking place, ClearPoint was also working out the details of the equity-like benefits that it had agreed to provide to Mr. deGorter. [Filing No. 1-4 at 5.] On December 10, 2017, a consultant hired by ClearPoint emailed Mr. Devlin and Mr. deGorter stating that his team had "developed a detailed financial model of the proposed Phantom Stock Plan." [Filing No. 1-4 at 5.]

In late January 2018, Mr. deGorter met with Mr. Devlin and Mr. Devin's father to discuss the Phantom Stock Plan. Mr. deGorter provided them with a copy of the OCC Notice that had been filed by Wachtell on his behalf, and Mr. Devlin and his father decided what share allocations to make to members of ClearPoint's Board of Directors and to Mr. deGorter as ClearPoint's CEO, while Mr. deGorter decided what share allocations to make to his management team. [Filing No. 1-4 at 5.] Mr. deGorter emailed the decisions to the consultant and copied Mr. Devlin on that email. [Filing No. 1-4 at 5-6.]

On February 13, 2018, the Board of Directors met, and Mr. deGorter "informed the board that he was working with a third-party, [the consultant], to develop a phantom stock plan for key management and board members, details will be sent once they are available." [Filing No. 1-4 at 6.] The Board had a special meeting on March 9, 2018 where Mr. deGorter "presented a summary document outlining the ClearPoint Phantom Stock Plan," and the Board approved the Phantom Stock Plan as outlined. [Filing No. 1-4 at 6.]

In or about March 2018, Mr. deGorter's OCC Notice was approved, allowing Mr. deGorter to proceed with acquiring the remaining 20.1% interest. [Filing No. 1-4 at 6.] Mr. deGorter contacted ClearPoint's counsel to complete the purchase, and counsel corresponded with Mr. deGorter and Mr. Devlin over the next few weeks to sort out the details regarding the sale. [Filing No. 1-4 at 7.]

On April 11, 2018, Mr. deGorter emailed Mr. Devlin advising that he was "putting together the materials for the Phantom Stock Plan, for distribution at the Board meeting" scheduled for April 25, 2018. [Filing No. 1-4 at 7.] The following day, Mr. deGorter asked Mr. Devlin when the closing of the sale would occur, and Mr. Devlin responded that it would be as soon as possible. [Filing No. 1-4 at 8.] Based on this information, Mr. deGorter sold securities that day to accrue some cash for the closing and, as a result, he "realized a significant capital gain and incurred a corresponding tax liability for 2018." [Filing No. 1-4 at 8.]

In mid-April 2018, Mr. Devlin "did an about-face" and decided that it was a good time to sell ClearPoint because "the company would fetch a significant premium above book value" and, because his family currently owned a large amount of shares in ClearPoint, they would make more money on the sale of the company. [Filing No. 1-4 at 8.] Accordingly, Mr. Devlin decided it

would be a good idea for ClearPoint to renege on its agreements with Mr. deGorter. [Filing No. 1-4 at 8.]

On April 24, 2018, Mr. deGorter met with Mr. Devlin and his father. [Filing No. 1-4 at 8.] Mr. deGorter gave Mr. Devlin and his father copies of the packages describing the Phantom Stock Plan, which he planned to distribute to the Directors at the Board meeting the following day. [Filing No. 1-4 at 8.] All three gentlemen then met with Thomas B. Michaud, the President and CEO of an investment bank and a broker-dealer (and as of the November 2017 sale, owner of 342 shares of ClearPoint stock). [Filing No. 1-4 at 8-9.] Mr. Michaud advised the men that "the market was probably in the sixth or seventh inning of the best time to sell ClearPoint." [Filing No. 1-4 at 9.] Following their meeting with Mr. Michaud, Mr. Devlin's father said that he was not comfortable with Mr. deGorter owning 30% of the equity of ClearPoint. [Filing No. 1-4 at 9.] Later that evening, Mr. Devlin instructed Mr. deGorter not to present the Phantom Stock Plan to the Board the following day, as Mr. deGorter had originally planned. [Filing No. 1-4 at 9.]

On April 30, 2018, Mr. Devlin told Mr. deGorter that there had been a misunderstanding concerning the sale of stock to Mr. deGorter, and that Mr. Devlin was working on a plan that was different from the one reflected in the Phantom Stock Plan. [Filing No. 1-4 at 9.] A few days later, Mr. Devlin emailed Mr. deGorter saying he was "unaware that we actually came to a final conclusion" on the Phantom Stock Plan, despite the Board having already approved the Phantom Stock Plan at the March 9, 2018 special meeting. [Filing No. 1-4 at 9.] Over one month later, ClearPoint's counsel emailed Mr. deGorter and Mr. Devlin with a draft agreement that included a different stock purchase plan and stated that ClearPoint had no obligation "to continue, or cause the continuation, of [Mr. deGorter] in employment or any other Business Relationship with [ClearPoint]." [Filing No. 1-4 at 10.]

In November 2018, the Board of Directors met and Mr. Devlin invited Mr. Michaud's investment bank to make a presentation essentially saying that the time was right to sell ClearPoint. [Filing No. 1-4 at 10.] The following month, the Board of Directors had a status call to discuss the presentation. [Filing No. 1-4 at 10.] During the call, Mr. Devlin recommended that the Board approve selling ClearPoint, and the Board approved this recommendation. [Filing No. 1-4 at 10.]

On March 27, 2019, Mr. deGorter met with Mr. Devlin and discussed the draft agreement that ClearPoint's counsel had sent in June. [Filing No. 1-4 at 10.] Mr. Devlin advised Mr. deGorter that meetings with potential buyers of ClearPoint would be cancelled unless Mr. deGorter agreed to forego the previous compensation and benefit agreement he originally reached with ClearPoint and accept something less instead. [Filing No. 1-4 at 10-11.]

On April 12, 2019, Mr. Devlin sent Mr. deGorter an email with a proposed "bonus retention agreement," which provided that Mr. deGorter would receive a bonus if the following conditions were met: (1) a sale of ClearPoint was closes by December 31, 2021; (2) Mr. deGorter remains continuously employed by ClearPoint through the closing; and, (3) Mr. deGorter executes, delivers, and does not timely revoke, a release of claims in connection with the sale of ClearPoint. [Filing No. 1-4 at 11.] The "bonus retention agreement" also included a provision that would release ClearPoint and "its directors, officers, equity holders and agents and their respective affiliates and successors" from any known or unknown liability related to "any right, purported right or other claim or allegation to receive, purchase, or otherwise acquire any direct or indirect equity interest, or economic benefit in respect of any equity interest, in [ClearPoint] from any Released Person. . . ." [Filing No. 1-4 at 11-12.] In response, Mr. deGorter reminded Mr. Devlin of his original agreement with ClearPoint and said that the proposed "bonus retention agreement"

"modifies the transaction that I agreed to" and "does not meet my requirements." [Filing No. 1-4 at 12.]

Mr. deGorter received other documents from Mr. Devlin, his father, and another Board member, with each of them advising Mr. deGorter that they hoped he would be "part of the team to help sell this business" and that they wanted to "resolve [their] dispute so [they] can focus on moving the Bank forward." [Filing No. 1-4 at 12.] However, on June 4, 2019, Mr. Devlin's father sent Mr. deGorter an email saying that he "cannot entertain a proposal based on what you allege you and [Mr. Devlin] discussed before you started as CEO," that "you know that the reason we've been negotiating is that there was never an agreement," and that "[a]ll the conversations from the past, including about a 'Phantom Stock' plan, were only conversations and were never approved by the Board." [Filing No. 1-4 at 12-13.]

Despite ClearPoint performing the best that it ever had as a result of Mr. deGorter's leadership, ClearPoint terminated Mr. deGorter's employment effective July 31, 2019. [Filing No. 1-4 at 14.] Mr. deGorter's employment was terminated so that ClearPoint would not have to honor its employment agreement with him and, consequently, Mr. Devlin and his family would maximize the amount of money they would receive when ClearPoint was sold. [Filing No. 1-4 at 13.] On August 28, 2019, Mr. deGorter filed this action. [Filing No. 1 at 7.]

Mr. deGorter's Complaint alleges that:

- ClearPoint has breached its contractual obligations to Mr. deGorter, and he has been damaged as a proximate result of the breaches;

- Mr. Devlin owed Mr. deGorter the fiduciary duties to deal fairly, honestly, and openly, and to not be distracted from the performance of his official duties by his or his family's personal interests, but Mr. Devlin breached these duties;

- Mr. Devlin tortiously interfered with Mr. deGorter's rights under his employment agreement with ClearPoint; and,

- Mr. deGorter has been damaged as a proximate result of Mr Devlin's breaches and tortious interference, which were intentional, malicious, willful, and wanton.

[Filing No. 1 at 14.]

ClearPoint and Mr. Devlin have both filed Motions to Dismiss, which are ripe for the Court's review.

### III.
#### DISCUSSION

**A. ClearPoint's Motion to Dismiss**

*1. Breach of Contract Claim*

In its Motion to Dismiss, ClearPoint argues that Mr. deGorter's claim against ClearPoint should be dismissed because it does not allege the existence of an enforceable contract. [Filing No. 26 at 5.] ClearPoint argues that the alleged employment agreement that Mr. deGorter had with ClearPoint is not enforceable because it was not in writing and was not approved by the Board of Directors, which is required under 12 C.F.R. § 163.39(a), a regulation promulgated by the OCC that applies to federal savings associations. [Filing No. 26 at 5.] ClearPoint argues that this regulation essentially acts as a statute of frauds. Although 12 C.F.R. § 163.39(a) has not been litigated often and there are no applicable cases citing this regulation, ClearPoint argues that authority related to the predecessor of this regulation—12 C.F.R. § 563.39(a)—is applicable here because section 163.39(a) is simply the recodification of section 563.39(a). [Filing No. 26 at 6.] ClearPoint argues that because Mr. deGorter's Complaint alleges that "ClearPoint and [Mr. deGorter] entered into an agreement under which [Mr. deGorter] became ClearPoint's President and CEO, and ClearPoint agreed to provide [Mr. deGorter] . . . compensation and benefits," the

agreement was an employment agreement that was required to be in writing and approved by ClearPoint's Board of Directors pursuant to 12 C.F.R. § 163.39(a). [Filing No. 26 at 7.] However, ClearPoint contends that Mr. deGorter's Complaint does not allege that the employment contract was reduced to writing or was approved specifically by ClearPoint's Board of Directors. [Filing No. 26 at 7.] Therefore, ClearPoint argues, the agreement is not valid and, consequently, Mr. deGorter has failed to state a breach of contract claim against deGorter. [Filing No. 26 at 7-8.] ClearPoint also argues that Mr. deGorter's Complaint should be dismissed with prejudice because Mr. deGorter will not be able to amend his Complaint to include allegations demonstrating the existence of a written contract, and he has, therefore, pled himself out of court. [Filing No. 26 at 9.]

In response, Mr. deGorter argues that ClearPoint cites no case holding that 12 C.F.R. § 163.39(a) bars claims by an employee against the contracting party. [Filing No. 36 at 1.] Instead, he argues, the cases cited by ClearPoint applying the predecessor regulation are inapposite because they involved individuals seeking to recover after a savings association had failed and been taken over by its federal insurer. [Filing No. 36 at 1.] Mr. deGorter also argues that the purpose of the regulation is to prevent a federal savings association from entering into employment agreements with officers or employees "if such contract[s] would constitute an unsafe or unsound practice," and would "place the institution at risk," [Filing No. 36 at 8 (citing 12 C.F.R. § 163.39(a) and 12 C.F.R. § 563.39)], while, the purpose of a statute of frauds is "to preclude fraudulent claims that would likely arise when the word of one person is pitted against the word of another . . . and to remove the temptation of perjury by preventing the rights of litigants from resting wholly on the precarious foundation of memory." [Filing No. 36 at 9 (quoting *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. 2001) (citations omitted)).] Mr. deGorter also argues that the regulation does not apply

here because the contract is not one that puts ClearPoint at risk.  [Filing No. 36.]  Additionally, Mr. deGorter argues that the regulation regarding employment agreements being in writing does not apply here because neither his Complaint nor ClearPoint's Motion to Dismiss establish that the contract was not in writing and had not been approved by ClearPoint's Board.  [Filing No. 36 at 11.]  Mr. deGorter argues that the Complaint does not state that the contract was entirely oral; instead, it demonstrates that Mr. deGorter knows of several writings that evidence the contract existed.  [Filing No. 36 at 12.]

Mr. deGorter argues that there is no basis for dismissing his Complaint with prejudice because "[e]ven if ClearPoint could assert its own failure to comply with a federal regulation as a defense to [Mr.] deGorter's claims, there would still be a set of facts under which [Mr.] deGorter may recover, and the Court would be obliged to allow [Mr.] deGorter to plead them."  [Filing No. 36 at 20.]

In reply, ClearPoint argues that the clear and unambiguous language of section 163.39(a) requires dismissal of deGorter's claim for breach of contract.  [Filing No. 37 at 1.]  ClearPoint argues that Mr. deGorter cites no case where a court concluded that the requirements of section 163.39(a) apply to a contract only "if such contract would constitute an unsafe or unsound practice."  [Filing No. 37 at 2 (quoting 12 C.F.R. § 163.39(a)).]  Further, ClearPoint argues, "[a]lthough [Mr.] deGorter argues he 'knows of multiple writings that evidence the contract,' his Complaint fails to allege any specific written employment contract."  [Filing No. 37 at 4.]  ClearPoint argues that having writings "evidencing" a contract is not the same as having an actual written contract.  [Filing No. 37 at 4.]  ClearPoint also points out that Mr. deGorter fails to allege that the Board of Directors approved a written contract, which is required; instead, Mr. deGorter simply alleges that Mr. Devlin agreed to Mr. deGorter's conditions, and this allegation is

insufficient to meet the requirements of 12 C.F.R. § 163.39(a).  [Filing No. 37 at 5.]  ClearPoint argues that because Mr. deGorter has failed to allege the existence of a written, enforceable contract, he has failed to state a claim for breach of contract.  [Filing No. 37 at 5.]  ClearPoint reiterates that the Court should dismiss Count I of Mr. deGorter's Complaint with prejudice because repleading would be futile, as there is no set of facts under which he can state a claim against ClearPoint.  [Filing No. 37 at 14.]

12 C.F.R. § 163.39(a) provides:

> (a) General.  *A Federal savings association may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section.  All employment contracts shall be in writing and shall be approved specifically by an association's board of directors.*  An association shall not enter into an employment contract with any of its officers or other employees if such contract would constitute an unsafe or unsound practice.  The making of such an employment contract would be an unsafe or unsound practice if such contract could lead to material financial loss or damage to the association or could interfere materially with the exercise by the members of its board of directors of their duty or discretion provided by law, charter, bylaw or regulation as to the employment or termination of employment of an officer or employee of the association.  This may occur, depending upon the circumstances of the case, where an employment contract provides for an excessive term.

12 C.F.R. § 163.39(a) (emphasis added).  As noted by ClearPoint, there are only two cases that have cited this regulation, neither of which are applicable to the issues here.  However, the application of caselaw is unnecessary because the language of the regulation is unambiguous and dispositive.  An employment contract for an officer or other employee of a savings association must be in writing and be approved specifically by the saving association's board of directors.  12 C.F.R. § 163.39(a).  Mr. deGorter does not dispute that ClearPoint is a savings association that is subject to this regulation. Regarding the in-writing requirement, Mr. deGorter does not deny that the employment contract was not in writing, but instead states: "[t]he Complaint does not say that

the contract was purely oral. Nor does Clearpoint's Motion establish that it was." [Filing No. 36 at 12.] He also states that there is not "any basis on which to conclude that deGorter cannot prove that the ClearPoint board approved his agreement." [Filing No. 36 at 12.] But these contorted arguments do not save Mr. deGorter's breach of contract claim from dismissal. Either the contract was in writing or it was not, and either the contract was approved by the Board or it was not. And Mr. deGorter has not alleged that the employment contract was in writing or that the Board approved the employment contract. Although the Board did approve the Phantom Stock Plan, as outlined, the Phantom Stock Plan does not equate to Mr. deGorter's employment contract. Because the employment contract has not met the in-writing and Board-approval requirements, it is unenforceable and, therefore, cannot be the basis of Mr. deGorter's breach of contract claim against ClearPoint.

The Court finds Mr. deGorter's argument regarding the policies underlying the regulation as beyond a statute of frauds unpersuasive. First, as explained previously, the Court does not need to consider the policy considerations behind the regulation because the language of the regulation is clear and unambiguous. *Fleischer v. Resolution Tr. Corp.*, 882 F. Supp. 1010, 1013-14 (D. Kan. 1995), *aff'd sub nom. Fleisher v. F.D.I.C.*, 113 F.3d 168 (10th Cir. 1996) ("[T]he clear and unequivocal language of 12 C.F.R. §563.39(a) is dispositive here. Because plaintiffs were officers, and because their agreements were not in writing, their agreements are unenforceable."). Other courts analyzing 12 C.F.R. § 563.39(a)—the predecessor of 12 C.F.R. § 163.39(a)—reached the same conclusion. *Aronson v. Resolution Tr. Corp.*, 38 F.3d 110, 112 (9th Cir. 1994) ("Although no federal court has yet relied on [the in-writing and Board-approval] requirements to declare an employment contract unenforceable, the clear and unequivocal language of 12 C.F.R. § 563.39(a) is dispositive in the instant case. . . . Pursuant to the express language of 12 C.F.R. § 563.39(a),

Aronson's oral agreement is not enforceable."); *Bianco v. H.F. Ahmanson & Co.*, 897 F. Supp. 433, 439 (C.D. Cal. 1995) ("Here, Plaintiff has produced no evidence, nor does she even allege in her Complaint, that her employment contract was approved by Home Savings' board of directors. Furthermore, . . . Plaintiff has produced insufficient evidence of any written employment contract."); *Fleischer*, 882 F. Supp. at 1013-14 ("[P]laintiffs admit they did not have written contracts with FSA. . . . As officers, § 563.39 applies to the form and content of their employment agreements. . . . Because plaintiffs were officers, and because their agreements were not in writing, their agreements are unenforceable.").

Here, like the cases cited above, there is no allegation (or even an indication) that the agreement was in writing or approved by the Board. Therefore, the employment contract is unenforceable under 12 C.F.R. § 163.39(a).

### 2. *Alternative Legal Theories*

In his brief in opposition, Mr. deGorter argues, in the alternative, that his employment agreement can be enforced through the doctrines of promissory estoppel, part performance, and *quantum meruit*. Although Mr. deGorter did not plead these theories in his Complaint, "a plaintiff is not required to plead legal theories." *Phillips v. Baxter*, 768 F. App'x 555, 558-59 (7th Cir. 2019); *ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) ("Complaints plead *claims*, which is to say grievances. . . . [C]omplaints need not cite authority or set out a line of legal argument. . . . Making legal arguments in support of one's claim comes after the pleadings.") (emphasis in original and internal citations omitted). The Court will consider each of these alternative legal theories in turn.

i.  Promissory Estoppel

Mr. deGorter argues that he can avoid the statute of frauds issue by pleading a promissory estoppel theory because he can show "that the other party's refusal to carry out the terms of the agreement resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss."  [Filing No. 36 at 13 (quoting *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557, 568 (Ind. 2006)).]  Mr. deGorter argues that Indiana's more stringent standard for removing an agreement from the Statute of Frauds does not apply here because the Indiana Statute of Frauds is not implicated; instead, Mr. deGorter argues, the less demanding standard found in section 139 of the Restatement of Contracts (Second) applies.  [Filing No. 36 at 14.]  Nevertheless, regardless of which standard applies, Mr. deGorter argues that he satisfies either standard because the facts show (1) a promise that the promisor should reasonably expect to induce action on the part of the promisee or a third party, (2) which did induce action or forbearance, and, (3) injustice can be avoided only by enforcing the promise. [Filing No. 36 at 15.]  Mr. deGorter argues that he reasonably relied on ClearPoint's promise to facilitate Mr. deGorter's purchase of 30% of the total equity when he purchased the initial 9.9% and obtained approval from the OCC to purchase an additional 20.1%.  [Filing No. 36 at 16-17.] Mr. deGorter also points out that he detrimentally relied on the promise when he sold securities to get cash for the purchase, thereby realizing a significant capital gain and incurring a large tax liability.  [Filing No. 36 at 17.]  Mr. deGorter argues that these losses are more than a simple inconvenience; they are unjust and unconscionable.  [Filing No. 36 at 17.]

ClearPoint argues that Mr. deGorter did not, and cannot, allege a viable claim for promissory estoppel under Indiana law because he cannot show that his reliance resulted in an injury "so substantial and independent as to constitute an unjust and unconscionable injury and

loss." [Filing No. 37 at 7 (quoting *Whiteco Indus., Inc. v. Kopani*, 514 N.E.2d 840, 844 (Ind. Ct. App. 1987)).] ClearPoint argues that the Complaint does not allege any injuries that are separate from the contractual damages; the alleged injuries are just "incidental expenses," at most. [Filing No. 37 at 7-8.] Moreover, ClearPoint argues, Mr. deGorter may not "use promissory estoppel to enforce the very promise that section 163.39(a) renders unenforceable." [Filing No. 37 at 7.] ClearPoint also argues that Indiana's promissory estoppel standard should be applied because this Court is sitting in diversity. [Filing No. 37 at 8.]

It is well established that under the Erie doctrine, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Because this case involves diversity of citizenship, the Court shall apply Indiana state law related to promissory estoppel.

The elements of promissory estoppel include: "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). However, "to remove the case from the operation of the Statute of Frauds, the party must show [ ] that the other party's refusal to carry out the terms of the agreement has resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss." *Id.* (alteration in original) (citation omitted). In *Brown*, the Indiana Supreme Court explained that the determination of whether the plaintiff suffered an "unjust and unconscionable injury and loss" is based on "the degree of consideration given in reliance on an oral promise." *Id.* The Supreme Court instructed that "[i]f what the party gave up in reliance on an oral promise was no greater than what the party would have given up in any

16

event, then the consideration is deemed insufficient to remove the oral promise from the operation of the Statute of Frauds." *Id.* (holding that although plaintiff "quit her modest job, dropped out of college at the end of the semester, and moved back to Indiana from Missouri where she had been living with her parents," her reliance on the defendant's oral promise did not result in the "'infliction of an unjust and unconscionable injury and loss' that would remove the promise from the operation of the Statute of Frauds"); *see also Hrezo v. City of Lawrenceburg*, 934 N.E.2d 1221, 1233 (Ind. Ct. App. 2010) ("[Plaintiff's] dealings with the [defendant] on a project that never came to fruition inconvenienced [plaintiff]; however, such actions by [plaintiff] are actions it would have had to take in order to finalize the contract on any basis. Moreover, [plaintiff] does not point to any independent benefit bestowed upon [defendant] by the action [plaintiff] took in furtherance of the negotiations and planning.").

Here, the regulation requiring an employment contract be in writing and approved by the Board of Directors to be enforceable acts as a Statute of Frauds. To remove ClearPoint's promise from this Statute of Frauds, Mr. deGorter would have to meet the "unjust and unconscionable injury and loss" element to be able to bring a promissory estoppel claim against ClearPoint. The injuries and losses Mr. deGorter alleges are his: (1) purchase of 990 shares of ClearPoint; (2) obtaining the OCC's approval to because a "Control Party"; (3) work with ClearPoint's consultant to implement the equity-like benefit plan and get the plan approved by the Board; (4) sale of securities to get cash to purchase the additional 2,010 shares; (5) realization of significant capital gain and corresponding tax liability; and, (6) having been deprived of the benefits of the promise. [Filing No. 36 at 17.] Although Mr. deGorter may have been inconvenienced by taking these actions in reliance on ClearPoint's promise, these are actions that he would have to take in any event. In other words, what Mr. deGorter "gave up in reliance on [ClearPoint's and/or Mr.

Devlin's] oral promise was no greater than what [he] would have given up in any event," and therefore, "the consideration is deemed insufficient to remove the oral promise from the operation of the Statute of Frauds." *Brown*, 758 N.E.2d at 52. Accordingly, Mr. deGorter has failed to state a claim for promissory estoppel, and this legal theory cannot be the basis for his claim against ClearPoint.

ii.  Part Performance

Mr. deGorter argues that he would also be able to proceed on the doctrine of part performance, even if enforcement of the employment contract is barred by the regulation. Mr. deGorter argues that the Complaint discusses the existence of the employment contract, multiple actions taken in reliance on the contract, and performance by deGorter in furtherance of the contract. [Filing No. 36 at 18.] Mr. deGorter contends that he became the President and CEO of ClearPoint and "ClearPoint never performed better than it did under [his] leadership." [Filing No. 36 at 18 (quoting Filing No. 1-4 at 13).] He argues that allowing ClearPoint to avoid honoring its contractual obligations would be the kind of unjust result that is sought to be prevented by the doctrine of part performance. [Filing No. 36 at 18.]

ClearPoint argues that Mr. deGorter cannot rely on the doctrine of part performance because Indiana courts have limited the application of this doctrine to oral promises to sell real estate. [Filing No. 37 at 10.]

The Indiana Supreme Court stated in *Coca-Cola Co. v. Babyback's Int'l, Inc.* that "the doctrine [of part performance] has been found to apply only to some of the six types of transactions specifically governed by the subsections of the Statute of Frauds." 841 N.E.2d 557, 566 (Ind. 2006) (noting two examples as "a promise to answer for the debt of another" and "a contract for the sale of land"). ClearPoint is correct in stating that Indiana courts have traditionally limited the

application of the doctrine of part performance to certain oral contracts, including, most commonly, oral promises to convey real estate. *See id.* at 567 (noting that with real estate contracts, the "evidence of part performance is relatively clear, definite, and substantial," as opposed to other types of agreements where "the nature of evidentiary facts potentially asserted to show part performance" are "vague, subjective, imprecise, and susceptible to fraudulent application"); *see also Dupont Feedmill Corp. v. Standard Supply Corp.*, 395 N.E.2d 808, 811 (Ind. Ct. App. 1979) ("Circumstances generally held sufficient to invoke the doctrine of part performance as an exception to the Statute of Frauds are some combination of the following: payment of the purchase price or part thereof, possession, and lasting and valuable improvements on the land."). The Seventh Circuit has declined to extend the doctrine of part performance beyond such contexts, *Luson Intern. Distribs., Inc. v. Mitchell*, 939 F.2d 493, 498 (7th Cir. 1991), and this Court will do the same. Because the oral contract here is an employment agreement, which is not the type of agreement typically enforceable through the doctrine of part performance, Mr. deGorter may not rely on this legal theory to remove the agreement from the Statute of Frauds presented by the regulation. Accordingly, part performance cannot be the basis for Mr. deGorter's claim against ClearPoint.

### iii.  *Quantum Meruit*

Mr. deGorter raises the theory of *quantum meruit* as his final equitable claim that he argues he may pursue if the contract is unenforceable pursuant to the regulation. Mr. deGorter argues that "[t]he Complaint establishes that [Mr.] deGorter has conferred a measurable benefit on ClearPoint such that ClearPoint's retention of the benefit without payment to [Mr.] deGorter would be unjust." [Filing No. 36 at 19.]

In response, ClearPoint argues that the Complaint does not allege that ClearPoint was unjustly enriched, especially because ClearPoint's stock holds the same value regardless of who owns the shares (*i.e.*, ClearPoint did not benefit from Mr. deGorter buying 990 shares). [Filing No. 37 at 13.]

*Quantum meruit* "is a legal fiction invented by the common-law courts in order to permit a recovery . . . where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Clark v. Peoples Sav. & Loan Ass'n*, 46 N.E.2d 682 (Ind. 1943). *Quantum meruit* "prevents unjust enrichment by permitting one to recover the value of work performed or material furnished if used by another and if valuable." *Carr v. Pearman*, 860 N.E.2d 863, 870 (Ind. Ct. App. 2007).

Although Mr. deGorter generally argues that he conferred a benefit upon ClearPoint for which he should be compensated, he has not identified exactly what that benefit is. If the alleged benefit is that he purchased 990 shares of ClearPoint and made preparations to purchase an additional 2,010, it is unclear in what way ClearPoint was unjustly enriched by this. As ClearPoint points out, the value of ClearPoint's stock is not affected by who owns it—the value remains the same. If the alleged benefit is earnings and assets that grew as a result of Mr. deGorter's leadership as CEO and President, as well as ClearPoint's "improved relationship with the OCC" and the "strategic roadmap for ClearPoint that drove growth and shareholder value," [Filing No. 1-4 at 13], then Mr. deGorter may potentially have a claim for *quantum meruit* or unjust enrichment. However, Mr. deGorter's Complaint lacks any allegation that ClearPoint was unjustly enriched or that Mr. deGorter is entitled to recover money from ClearPoint for these alleged benefits, and

instead suggests that Mr.deGorter received payment for such services. Therefore, as currently pled, Mr. deGorter's Complaint does not state a claim for *quantum meruit* against ClearPoint.

For the foregoing reasons, Mr. deGorter's breach of contract claim against ClearPoint is **DISMISSED WITHOUT PREJUDICE**.[1]

## B. Mr. Devlin's Motion to Dismiss

### 1. Tortious Interference

In their briefs, the parties outline their arguments regarding Mr. deGorter's claim for tortious interference with a contractual relationship against Mr. Devlin. However, because the Court finds that the employment contract is unenforceable, Mr. deGorter's tortious inference claim necessarily fails and the Court need not summarize the parties' arguments.

The five elements of a claim for tortious interference with a contractual relationship are: (1) "existence of a valid and enforceable contract"; (2) "defendant's knowledge of the existence of the contract"; (3) "defendant's intentional inducement of breach of the contract"; (4) "the absence of justification"; and, (5) "damages resulting from defendant's wrongful inducement of the breach." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994). As already discussed, Mr. deGorter's employment contract is unenforceable because it was not in writing and not approved by ClearPoint's Board of Directors. Therefore, there is a lack of a valid and enforceable contract, which is a required element for a tortious interference claim. Accordingly, Mr. deGorter cannot state a claim for tortious interference with a contractual relationship claim against Mr. Devlin and, accordingly, this claim is **DISMISSED WITHOUT PREJUDICE**.

---

[1] Although the dismissal is without prejudice, Mr. deGorter should be thoughtful about whether filing an Amended Complaint asserting a breach of contract claim against ClearPoint is appropriate, given the requirements of 12 C.F.R. § 163.39(a) and the requirements of Fed. R. Civil Proc. 11.

2. *Breach of Fiduciary Duty*

Mr. Devlin argues that Mr. deGorter's breach of fiduciary duty claim fails because Mr. Devlin did not owe Mr. deGorter a fiduciary duty as an employee of ClearPoint. [Filing No. 11 at 10.] Mr. Devlin cites Indiana law stating that a director owes fiduciary duties only to the company and/or the shareholders, not employees. [Filing No. 11 at 10.] Further, Mr. Devlin argues, directors only owe shareholders fiduciary duties "regarding matters that affect the general well-being of the corporation. . . . Where the actions of a director affect the individual rights of a stockholder rather than interests of the corporation or stockholders generally, no fiduciary duty exists." [Filing No. 11 at 10 (quoting *Biberstine v. N.Y. Blower Co.*, 625 N.E.2d 1308, 1318 (Ind. Ct. App. 1993)).] Mr. Devlin argues that no fiduciary duty exists here because Mr. deGorter "is not complaining about duties [Mr.] Devlin, as Chair, owed to ClearPoint or its stockholders, but to duties [Mr.] deGorter alleges [Mr.] Devlin owed him personally, with respect to [Mr.] deGorter's rights as an employee," and therefore, the breach of fiduciary duty claim fails. [Filing No. 11 at 13.]

In response, Mr. deGorter argues that Mr. Devlin's argument regarding lack of a fiduciary duty misses the mark because ClearPoint is a closely-held company, and under Indiana law, "shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders." [Filing No. 18 at 2 (quoting *Barth v. Barth*, 659 N.E.2d 559, 661 (Ind. 1995)).] Mr. deGorter notes that Mr. Devlin, in addition to being the Chair of the Board of Directors, was a fellow shareholder, [Filing No. 18 at 2], and, as explained in *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 24 (Ind. 2001):

> a shareholder of a close corporation may proceed against a fellow
> shareholder in a direct action if that form of action would not: (1)

22

unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interest of creditors of the corporation, or (3) interfere with a fair distribution of the recovery among all interested persons[.]

[Filing No. 18 at 5].

In reply, Mr. Devlin argues that Mr. deGorter has shifted his theory of liability to fiduciary duties owed by fellow shareholders. [Filing No. 23 at 1.] Mr. Devlin further argues that this theory of liability also fails because Mr. deGorter is not a shareholder, his IRA is. [Filing No. 23 at 1.] Mr. Devlin also argues that even if Mr. deGorter could maintain a claim for breach of fiduciary duty, that claim still fails because Mr. deGorter is not alleging that Mr. Devlin deprived Mr. deGorter of any rights as a shareholder, but instead is complaining about deprivation of personal rights he alleges he has as an employee under an oral employment agreement. [Filing No. 23 at 3.] Mr. Devlin argues that Mr. deGorter did not contest the fact that "a director does not stand in a fiduciary relationship or owe fiduciary duties to company employees." [Filing No. 23 at 6.]

Mr. deGorter filed a Motion for Leave to File a Surreply, [Filing No. 24], along with his proposed Surreply addressing two points Mr. Devlin raised for the first time in his Reply. [Filing No. 24 at 2.] The Court **GRANTS** Mr. deGorter's Motion for Leave to File a Surreply, and will consider the issues raised in the Surreply. Mr. deGorter argues that Mr. Devlin's argument regarding his IRA being the shareholder is flawed because "[u]nlike a trust or a business entity, a self-directed IRA is not a legal entity that is distinct from its owner." [Filing No. 24-1 at 3 (quoting *Brady v. Park*, 445 P.3d 395, 423 (Utah 2019)).] Mr. deGorter also argues that Mr. Devlin failed to address or even mention the applicable law regarding duties owed by shareholders in closely-held businesses in Indiana. [Filing No. 24-1 at 4.]

"A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3)

harm to the beneficiary." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015). As an initial matter, the Court finds that it is inconsequential that Mr. deGorter's self-directed IRA owned the shares, not Mr. deGorter himself, because "assets held in a self-directed IRA are property of the IRA's owner," *Brady*, 445 P.3d at 423, and several courts have acknowledged that "the owner necessarily has standing to bring or defend claims directly implicating his or her interest in the IRA." *Id.* at 423-24 nn.96-97, 100-102 (collecting cases).

The Court next moves to Mr. Devlin's argument that Mr. deGorter's claim fails because Mr. deGorter is not alleging deprivation of his general rights as a shareholder, but instead, personal rights he alleges he had as an employee under the agreement with ClearPoint. Under Indiana law, "shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders." *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995). Mr. Devlin does not deny that ClearPoint is a closely-held entity.[2] Consequently, under Indiana law, Mr. deGorter may bring a breach of fiduciary duty claim directly against Mr. Devlin as a fellow shareholder, as long as such a direct action "would not: (1) unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors of the corporation, or (3) interfere with a fair distribution of the recovery among all interested persons." *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 236 (Ind. 2001). That said, although "[s]hareholders in a closely held corporation generally stand in a fiduciary relationship to each other[,] that relationship does not necessarily extend beyond matters that do not 'affect the general well-being of the corporation.'" *Epperly v.*

---

[2] "A close corporation is one which typically has relatively few shareholders and whose shares are not generally traded in the securities market." *W & W Equip. Co., Inc. v. Mink*, 568 N.E.2d 564, 570 (Ind. Ct. App. 1991).

*Johnson*, 734 N.E.2d 1066, 1076 (Ind. Ct. App. 2000) (quoting *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 44 (Ind. Ct. App. 1980) (internal citation omitted)).

In his Complaint, Mr. deGorter alleges that "[Mr. Devlin] owes [Mr. deGorter] fiduciary duties. These include the duty to deal fairly, honestly, and openly with [Mr. deGorter], and the duty not to be distracted from the performance of [Mr. Devlin's] official duties by [his] or his family's personal interests." [Filing No. 1-4 at 13.] This allegation does not specify in what capacity Mr. Devlin owed a fiduciary duty to Mr. deGorter—as a fellow shareholder or as an employee. Given the standard on a motion to dismiss, Mr. deGorter's non-specific allegation is sufficient to state a claim for breach of fiduciary duty as a fellow shareholder in a closely-held corporation. However, to the extent Mr. deGorter is attempting to assert a claim as an employee for breach of fiduciary duty by Mr. Devlin as the Chair of the Board of Directors, that claim fails because a director does not owe a fiduciary duty to protect an employee's interests or the personal interests of a shareholder that do not "affect the general well-being of the corporation." *Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1318 (Ind. Ct. App. 1993) ("Where the actions of a director affect the individual rights of a stockholder rather than interests of the corporation or stockholders generally, no fiduciary duty exists."); *Zusy v. Int'l Med. Grp., Inc.*, 500 F. Supp. 2d 1087, 1100 (S.D. Ind. 2007). If Mr. deGorter's claim is based on his complaints regarding the termination of his employment and his not being able to purchase more shares of ClearPoint, the claim fails because it is a personal one, as opposed to one generally affecting the well-being of ClearPoint. *See Kesling v. Kesling*, 546 F. Supp. 2d 627, 640 (N.D. Ind. 2008) ("[T]he fiduciary duties often associated with being a shareholder or director in a closely-held corporation do not generally apply to personal transactions. . . ."). On the other hand, if Mr. deGorter's claim is based on his interests as a shareholder, then he may have a valid claim against Mr. Devlin for breach of

a fiduciary duty of a fellow shareholder in a closely-held organization. This potential claim is a factually-nuanced one that would benefit from discovery. *See Tecnomatic, S.p.A. v. Remy, Inc.*, 2012 WL 2376066, at *11 n.12 (S.D. Ind. June 22, 2012) (acknowledging that, "in some cases," determining whether a fiduciary relationship exists "is necessarily fact-specific").

For the foregoing reasons, to the extent Mr. deGorter asserts a claim as an employee for breach of a fiduciary duty against Mr. Devlin in his capacity as Chair of the Board of Directors, that claim is dismissed; however, Mr. deGorter's claim for breach of fiduciary duty owed to a shareholder by a fellow shareholder in a closely-held corporation may proceed. Accordingly, Mr. Devlin's Motion to Dismiss Mr. deGorter's breach of fiduciary duty claim is **GRANTED IN PART and DENIED IN PART**.

## IV.
### AMENDMENT

In his response to ClearPoint's Motion to Dismiss, Mr. deGorter states: "Even if ClearPoint could assert its own failure to comply with a federal regulation as a defense to [Mr.] deGorter's claims, there would still be a set of facts under which [Mr.] deGorter may recover, and the Court would be obliged to allow [Mr.] deGorter to plead them." [Filing No. 36 at 20.] Although the Court has decided to dismiss Mr. deGorter's claim against ClearPoint without prejudice, the Court admonishes Mr. deGorter that it could have chosen to make the dismissal with prejudice, just as the Court did in *Bailey v. Medtronic, Inc.*, 2017 WL 6035329, *6 n.2 (S.D. Ind. Dec. 6, 2017) ("Here, the Baileys chose not to revise their allegations[—pursuant to Federal Rule of Civil Procedure 15(a)(1)(B)—]relating to Count IV despite being aware of Defendant's arguments in support of dismissal and chose instead to brief the current Motion to Dismiss and adjudicate the issues. The Court is not required to give the Baileys another chance to plead their breach of warranty claim and, in its discretion, the Court dismisses Count IV of the Complaint with

prejudice.").  The Court also warns that Mr. deGorter's decision to file a brief in response to ClearPoint's Motion to Dismiss and then, in the text of brief, essentially ask the Court for leave to amend his Complaint may be a situation that could warrant the application of sanctions.  *See* 28 U.S.C. § 1927 ("Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").  If Mr. deGorter had instead filed an Amended Complaint in response to ClearPoint's Motion to Dismiss, the Court could have avoided spending time and resources addressing the motion.

Should Mr. deGorter decide to amend his Complaint, he is reminded that, because the deadline for filing motions for leave to amend the pleadings has passed, [Filing No. 19 at 4], he must demonstrate good cause for doing so and must have the Court's permission, Fed. R. Civ. P. 16(b)(4).

### V.
#### CONCLUSION

As the popular saying goes, "a verbal contract isn't worth the paper it's written on."[3] Although Mr. deGorter may have had an employment arrangement with ClearPoint, it is not one that is enforceable by law.  On the other hand, a shareholder's breach of a fiduciary duty owed to a fellow shareholder in a closely-held corporation is actionable under Indiana law.

For the foregoing reasons:

- Mr. deGorter's Motion for Leave to File Surreply is **GRANTED** [24];

- ClearPoint's Motion to Dismiss is **GRANTED** [25];

---

[3] The Court does not attribute this quote to any one person, as it appears to have been said, in various iterations, byvarous people over the years, and its origin is the subject of debate. "Verbal Contract," Quote Investigator, *available at* https://quoteinvestigator.com/2014/01/06/verbal-contract/.

- Mr. Devlin's Motion to Dismiss, [10], is **GRANTED IN PART** and **DENIED IN PART**, as follows:

  - Mr. Devlin's Motion to Dismiss the tortious interference with a contractual relationship claim is **GRANTED**;

  - Mr. Devlin's Motion to Dismiss the breach of fiduciary duty claim, to the extent the claim is against Mr. Devlin in his capacity as a fellow shareholder and not in his capacity as Chair of the Board of Directors, is **DENIED**.

Date: 1/31/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**